# United States Court of Appeals
## For the First Circuit

No. 00-1526

ADRIA INTERNATIONAL GROUP, INC.,
CRISWELL ASSSOCIATES, L.L.C.,

Plaintiffs, Appellants,

v.

FERRÉ DEVELOPMENT, INC.,
ANGOLA INVESTMENT, INC.,
MAR CHIQUITA DEVELOPMENT CORP., et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Lynch and Lipez, Circuit Judges,
and García-Gregory, District Judge.*

Mark S. Priver, with Santiago F. Lampon-González and Ohashi & Priver on briefs, for appellants.
Etienne Totti-del Valle, with Totti & Rodríguez Díaz on briefs, for appellees.

March 2, 2001

* Of the District of Puerto Rico, sitting by designation.

**LIPEZ, Circuit Judge.** This case involves a failed real-estate transaction, the defendants' refusal to return a $100,000 deposit given by the plaintiffs for an option to buy a valuable Puerto Rico beach-front property owned by the defendants, and the plaintiffs' lawsuit for breach of contract. On summary judgment, the district court awarded the $100,000 deposit to the defendants. The plaintiffs appealed. We reverse and remand for a trial because of the ambiguity of the agreement between the parties.

## I.

Plaintiffs Adria International Group, Inc. and Criswell Associates, L.L.C. are real-estate developers who hoped to build a luxury hotel, condominium units, and golf course on a piece of land on Puerto Rico's north coast known as the Mar Chiquita property. Mar Chiquita was owned by the defendants, Ferré Development, Inc., Angola Investment, Inc., and Mar Chiquita Development Corp. On June 6, 1996, the parties signed a Deed of Option to Purchase the property.

The deed established a purchase price of $7.5 million for Mar Chiquita. The plaintiffs agreed to pay this amount if they were successful in obtaining bond financing from the Puerto Rican government during the time periods specified in the deed. The deed provided for three separate option periods. The first period, described in Article Third (b) of the deed as the "Initial Option Period," gave the

-2-

plaintiffs a 90-day right to purchase in exchange for a $100,000 deposit to be held in escrow. This period could be extended for an additional 60 days at no additional cost to the plaintiffs.

Article Third (c) of the deed provided for a Second Option Period. It stated that for an additional $100,000, the plaintiffs "shall have the right, at any time prior to the expiration of the Initial Option Period, to extend the Option for an additional term of ninety (90) days to commence on the day after the termination of the Initial Option period (hereinafter referred to as the 'Second Option Period.')" In parallel terms, Article Third (d) of the deed provided for a Third Option Period in exchange for an additional $150,000 deposit.

After signing this agreement on June 4, 1996, the plaintiffs engaged Smith Barney to help them raise the equity they needed to qualify for government bond financing. They also met with representatives of Puerto Rico's tourism department seeking a needed endorsement from the Tourism Development Fund for issuance of the bonds. On September 4, 1996, the initial 90-day option period provided for in Article Third (b) of the deed expired. Adria International and Criswell Associates extended their option to buy for 60 more days until November 4 at no additional cost, as Article Third (b) allowed, because the defendants had not resolved a lawsuit that was clouding Mar

-3-

Chiquita's title. The litigation soon ended, and plaintiffs received notice of the relevant judgment on September 20.

Over the course of the fall, it became clear that Adria International and Criswell Associates were $6 million short of the equity they needed to secure the bond financing. The Tourism Development Fund said it would not guarantee the shortfall without the backup guarantee of another funding source. Without the help of Smith Barney, the plaintiffs contacted various parties, including professional golfer Chi Chí Rodriguez, in hopes of finding such a guarantor. According to the plaintiffs, Rodriguez committed to send them $200,000, half of which would replace the plaintiffs' deposit for the Initial Option Period and half of which would serve as consideration for the Second Option Period.

The plaintiffs hoped to receive the money from Rodriguez by November 4, the day on which the Initial Option Period expired, but the money did not arrive in time. Instead, María Luisa Fuster Zalduondo of the plaintiffs' law firm, McConnell Valdés, wrote a letter on November 4 to the defendants' lawyer, José Fuentes Agostini, confirming that the plaintiffs would deliver the $100,000 deposit for the Second Option Period the following day. The defendants orally agreed to meet on November 5 to receive delivery of the second $100,000. Because November 5 was Election Day, the parties then agreed to meet on November 6.

The November 6 meeting was held at the offices of McConnell Valdés. In attendance were Ricardo Hernández-Morales, the general manager of defendant Ferré Development Inc.; José Fuentes, the defendants' lawyer; William T. Criswell, IV, representing plaintiffs Adria International and Criswell Associates; and Harry O. Cook and Samuel Céspedes, the plaintiffs' lawyers. At the meeting, Criswell told Hernández that the money from Rodriguez still had not arrived, but that he hoped to receive it within the next ten days. Hernández expressed his disappointment. The parties then negotiated over the terms of a two-week extension of the plaintiffs' option. In lieu of the missing $100,000 deposit from Rodriguez, Criswell offered the approximately $1 million fee that his principals would have owed Smith Barney if they had succeeded in securing financing for the deal.[1]

The parties' new agreement was set forth in a letter drafted quickly by Céspedes, one of the plaintiffs' lawyers, so that Criswell could catch a flight to Europe. The letter was headed "Re: Deed of Option to Purchase Mar Chiquita Properties." It said in full:

Dear Mr. Hernández:

In connection with the aforementioned deed (the "Deed"), we hereby request an extension of the Initial Option Period, as such term is defined in Article Third (a) of the

---

[1] Criswell said that at the time he made the offer, he thought the fee was in the range of $600,000. At some point, either during the meeting or shortly after it ended, Cook called Smith Barney and learned that the fee, in fact, would have been as much as $1,050,000.

Deed, through midnight of November 20, 1996. If you agree with this option period extension, please signify so by signing in the space provided below. Your acceptance of this extension does not modify any future option periods contemplated in the Deed.

In consideration for the aforesaid extension, Purchaser shall pay to Sellers by certified or bank manager's check a sum equal to the fee that would otherwise have been paid to Smith Barney for the sale of limited partnership interests.

Cordially yours,

//s William T. Criswell

After reviewing the letter with Fuentes in private for a few minutes, Hernández signed it. The meeting quickly adjourned.

Over the next two weeks, the plaintiffs continued to seek funding from Rodriguez. That money did not materialize. On November 20, Cook sent a letter to Hernández terminating the plaintiffs' option to buy because the government bonds had not been approved. The plaintiffs asked Hernández to direct the escrow agent to return the $100,000 they had deposited in June for the Initial Option Period. On December 11, Fuentes replied to Cook in a letter that accused Adria International and Criswell Associates of acting in "bad faith," thus "waiv[ing] any possible right under the Deed . . . to request a return of the initial deposit."

On February 15, 1997, the plaintiffs sued for return of the $100,000 deposit. The defendants cross-claimed for the $1 million fee. On July 23, 1998, the plaintiffs moved for summary judgment, arguing

that the November 6 letter extended the Initial Option Period and was supported by adequate consideration. The plaintiffs contended that because the parties agreed in the letter to extend the Initial Option Period until November 20, that period had not expired before the plaintiffs terminated their option, entitling them to reclaim their deposit. On July 24, 1998, the defendants moved for summary judgment on their counter-claim, making two alternative arguments. First, the defendants argued that the November 6 agreement to extend the Initial Option Period was invalid because it was not supported by consideration. Second, they argued that if the agreement was supported by consideration, the plaintiffs breached it by refusing to pay the $1 million fee, which was not contingent on completion of the land purchase, contrary to the plaintiffs' assertion.

On November 24, 1999, the district court found for the defendants on the $100,000 claim. The court found that the November 6, 1996 letter was clear on its face, and that the letter demonstrated the parties' intent to extend the Initial Option Period until November 20, 1996. The court found, however, that this extension was not supported by consideration, and as a result the November 6 letter was not a valid contract. Thus the parties had failed to extend the Initial Option Period, entitling the defendants to retain the $100,000 deposit that the plaintiffs did not reclaim before that period expired.

The court also granted the plaintiffs' motion for summary judgment on the defendant's $1 million counter-claim for the fee "that would otherwise have been paid to Smith Barney." The defendants argued that payment of the fee was not contingent on completion of the land transaction. The court found that payment of the fee was contingent. The defendants did not appeal this ruling.

## II.

We review an award of summary judgment de novo. Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996). Summary judgment is appropriate in the absence of a genuine issue of material fact, when the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. See Wightman, 100 F.3d at 230.

The parties do not dispute that the Deed of Option to Purchase was a valid agreement supported by consideration. Their arguments instead concern the November 6 agreement and its relationship to the deed. The plaintiffs argue that the November 6 agreement was supported by consideration because it required them to relinquish control of the $100,000 deposit for two more weeks, and to pay the $1 million fee described in the agreement if the deal closed. In

-8-

addition, the plaintiffs contend that a duty to act in good faith tempered their right to terminate the option to buy.  The defendants argue that the letter was not supported by consideration and that the promises made by the plaintiffs were illusory.  The district court agreed with the defendants.

We begin with some general principles about consideration drawn from the laws of Puerto Rico.  Puerto Rican law provides that "a bilateral obligation assumed by each one of the parties to the contract, has, as its consideration, the promise offered in exchange." United States v. Pérez, 528 F. Supp. 206, 209 (D.P.R. 1981) (citing Del Toro v. Blasini, 96 P.R.R. 662 (1968)).  Both parties must be bound based on "mutual consideration" that yields either a benefit or a detriment to each party.  Id.  In defining legally sufficient consideration, the Puerto Rican Civil Code states: "In contracts involving a valuable consideration, the [presentation] or promise of a thing or services by the other party is understood as a consideration for each contracting party."  P.R. Laws Ann. 31 § 3431.  In construing this provision, the Puerto Rico Supreme court has said:

> By consideration is understood, for the purpose of determining the existence of a contract, the benefit or benefits which one party receives from the other, or the latter obligates himself to confer upon the former, and to which he had previously no right; or also, the damages which one party suffers because of the other, and which he was not obliged to suffer, the existence of the said benefits or damages being

> the reason which caused the other party to
> obligate himself.

Guerra v. Treasurer, 8 P.R.R. 280 (1905).

Here, because they did not have in hand the $100,000 deposit required by the deed to purchase a 90-day Second Option Period, the plaintiffs made an alternate offer: the possibility of a $1 million payment in exchange for a two-week extension of their option. The plaintiffs' promise in the November 6 agreement to pay the $1 million fee conferred two benefits on the defendants. First, they gained the possibility of winning a $1 million fee. Second, the defendants gained an increased likelihood that the land transaction would be completed, the plaintiffs having informed them that otherwise they would abandon their efforts to secure financing. These benefits constitute adequate consideration under Puerto Rican law.

There was also detriment to the plaintiffs in the November 6 agreement. The plaintiffs did not have the use of the $100,000 deposit for the Initial Option Period for two more weeks. More significantly, they put themselves at risk of paying the $1 million fee. "Any detriment to the opposite party is a valuable consideration." In re Las Colinas, Inc., 294 F. Supp. 582, 596 (D.P.R. 1968), vacated and remanded on other grounds, 426 F.2d 1005 (1st Cir. 1970); Bennett v. Boschetti, 31 P.R.R. 809 (1923).

The district court misunderstood the nature of the consideration that supported the November 6 agreement. The court said that the plaintiffs' promise to the defendants was illusory because payment of the $1 million fee "was conditioned on some future event which the Plaintiffs controlled," in other words, completion of the land deal.[2] The court continued:

> Plaintiffs had the right to cancel at any time within the IOP [Initial Option Period] if they, at their sole discretion, considered that they were unable to obtain the required approval for the issuance of guaranteed bonds for the financing of the hotel and golf course. Plaintiffs' rights were subjective in nature. Plaintiffs were not required to give any prior notice, nor was the termination reliant on an extrinsic event out of the Plaintiffs' control.

The court's reasoning was erroneous,[3] even though it is true that, "when the promised act is conditional on the occurrence of a future event within the control of the promisor, the promise is illusory." Crellin Technologies, Inc. v. Equipmentlease Corp., 18 F.3d 1, 8 (1st Cir. 1994) (citing Vickers Antone v. Vickers, 610 A.2d 120, 123 (R.I. 1992)); see also P.R. Laws Ann. 31 § 3043 (1990) (a contract

---

[2] The court also said that "[i]f the consideration was due up-front, as Defendants assert, it follows that the November 6th Letter is void for lack of consideration for Plaintiffs never paid the consideration." This rationale confuses a void contract with a breached one. A party's failure to pay agreed-upon consideration creates a breach of contract, but does not void the underlying agreement.

[3] Indeed, the court's logic would invalidate the original option agreement, as well as the November 6 agreement to extend.

is void if it includes a conditional obligation that depends on the "exclusive will" of one party); § 3373 ("The validity and fulfilment of contracts cannot be left to the will of one of the contracting parties."). In this case, the future event at issue was not wholly within the control of the plaintiffs.

In contrast to Crellin, where the parties had not signed a binding contract, the plaintiffs' obligation to seek financing for the land deal was subject to the duty of good-faith performance. "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205a (1981). Puerto Rican law imposes the duty of good faith performance on contracting parties. See An-Port, Inc. v. MBR Industries, Inc., 772 F. Supp. 1301, 1314 (D.P.R. 1991) ("The requirement of good faith between the parties in a contract . . . must guide all contacts between the contracting parties during the existence of the relationship."); AMECO v. Jaress Corp., 98 P.R.R. 820 (1970) (contracting parties have obligations by law that extend "to cover not only what has been expressly stipulated, but also the consequences which, according to their nature, are in accordance with good faith"); see also P.R. Laws Ann. 31 § 3375 (1990).

To fulfill their duty of good-faith performance, the plaintiffs had to seek financing for the land deal by negotiating with

third parties.  Thus their efforts to perform can be measured against the objective standard of whether they sought the third-party support that was central to the transaction.  See P.R. Laws Ann. 31 § 3063 ("If [the obligation] should depend . . . upon the will of a third person, the obligation shall produce all its effects); Hernández v. Cadilla, 21 P.R.R. 745 (1921) (fulfillment of condition that does not depend exclusively upon will of obligor, but also upon that of third person over whom he has no control, is fulfilled and the obligation is demandable if the obligor does all he was required to do); Resource Management Co. v. Weston Ranch and Livestock Co., Inc., 706 P.2d 1028, 1038 (Utah 1985) ("[T]he reservation by a promisor of a power to cancel upon the occurrence of some event not wholly controlled by the promisor himself does not render this promise illusory or the contract invalid. 'Even if the promisor is himself to be the judge of the cause or condition, he must use good faith and an honest obligation.'") (quoting 1A Corbin on Contracts § 165 at 86-87 (1963)).  The plaintiffs' negotiations with the Puerto Rican Tourism Department and Chi Chí Rodriguez reflect the kind of good-faith performance required by the contract.[4]  There was nothing illusory about the promise of the plaintiffs to pay a $1 million fee if the land transaction closed.

---

[4] While the defendants alleged bad faith on the plaintiffs' part in their pleadings, the district court found that there was no evidence to support this assertion.  We reach the same conclusion based on our reading of the record.

- 13 -

As an alternative ground for affirming the district court's judgment awarding them the $100,000 deposit, the defendants argue that the November 6 agreement was ambiguous and should be interpreted in their favor. The defendants note that Puerto Rican law provides that "[t]he interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity," P.R. Laws Ann 31 § 3478, and that the plaintiffs through their lawyers drafted the agreement. The plaintiffs, on the other hand, argue that the November 6 letter was clear on its face in extending the Initial Option Period. The district court agreed that the contract was clear on its face, but found that it was not supported by adequate consideration.

We look to Puerto Rican law for the standard for determining whether a contract is ambiguous. Puerto Rico's Civil Code provides:

> If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.
> If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.

P.R. Laws Ann. 31 § 3471 (1990). The Puerto Rican courts have construed this provision to mean the following: "Under Puerto Rican law, an agreement is 'clear' when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation.'" Borschow Hosp. and Med. Supplies, Inc. v. Cesar

Castillo, Inc., 96 F.3d 10, 15 (1st Cir. 1996), quoting Executive Leasing Corp. v. Banco Popular de Puerto Rico, 48 F.3d 66, 69 (1st Cir. 1995); see also Heirs of Ramírez v. Superior Court, 81 P.R.R. 347, 351 (1959).

The November 6 letter requests "an extension of the Initial Option Period as such term is defined in Article Third (a) of the Deed."  However, as the defendants point out, Article Third (a) speaks only of an "exclusive, irrevocable first option (the "Option"), while Article Third (b) of the deed defines the "Initial Option Period."[5] The plaintiffs say that this discrepancy is a typographical error with no import.  They argue that because "Initial Option Period" was a term of art used throughout the deed, both parties understood the November 6 letter to refer to the Initial Option Period as defined in Article Third (b).  We agree that the mistaken reference to Article Third (a) in place of Article Third (b) does not rise to the level of a genuine dispute of material fact about the meaning of the contract.

However, we find the letter to be ambiguous for another, more significant reason.  The letter fails to address the fate of the plaintiff's $100,000 deposit for the Initial Option Period.  It does not explain the relationship between the original consideration

---

[5]  Article Third (a) states in relevant part: "For good and valuable consideration, the receipt of which is hereby acknowledged, Sellers hereby give Purchasers and their assigns the exclusive, irrevocable, first option (the "Option") to purchase the Property for the purchase price described in Paragraph (e) below."

- 15 -

specified in the deed--the $100,000 deposit--and the newly agreed-upon consideration--the approximately $1 million conditional payment.  The plaintiffs argue that they detrimentally relied on the November 6 agreement by not reclaiming the deposit, thus allowing "those funds to remain at risk, and outside their absolute control."  The defendants respond that the plaintiffs had no right to recover the deposit after November 4 because the Initial Option Period had ended.  Nothing in the letter resolves this central disagreement.  Such silence can be a source of ambiguity, and we find that it is so here.  See Catullo v. Metzner, 834 F.2d 1075, 1079-80 (1st Cir. 1987) (where a settlement agreement was silent on the question of whether one party could operate a competing business, "[t]his silence creates doubt as to the intention of the parties").

Given the hurried negotiations that took place before and during the November 6 meeting, the letter's lack of clarity is not surprising.  The parties do not even agree on the significance of their agreement to meet on November 6 rather than on November 4, the day on which the Initial Option Period expired.[6]  The plaintiffs say the

---

[6] Nor did the letter explain the status of the fee to which it refers.  The letter does not say whether payment of the $1 million fee was contingent on completion of the land purchase.  It says only that the plaintiffs "shall pay . . . a sum equal to the fee that would otherwise have been paid to Smith Barney."  As we have noted, the defendants did not appeal the district court's ruling that the payment of the $1 million fee was contingent on completion of the land deal. We cite the issue only to emphasize further the letter's lack of clarity.

defendants agreed to extend the Initial Option Period until November 6. The defendants say they merely agreed to postpone receipt of the second $100,000 deposit required to begin the Second Option Period.

The meeting itself took place immediately after the parties learned that the Rodriguez money had not arrived, throwing the future of the Mar Chiquita sale into doubt. Moreover, Criswell was in a hurry to leave for Europe, and Hernández reviewed the letter with his lawyer for only a few minutes before signing it. Under considerable pressure and time constraints, the parties improvised in hopes that the deal could be salvaged. But they failed to draft an agreement that settled what would happen to the $100,000 deposit. Tellingly, neither side claims to have mentioned the deposit until the plaintiffs decided to terminate the option and laid claim to the money nearly two weeks later.

The defendants argue that if the November 6 letter is ambiguous, they should prevail because Puerto Rican law provides that the interpretation of an ambiguous contract must not favor the party responsible for the ambiguity. See P.R. Laws Ann. 31 § 3478. A court may state the meaning of a contract on summary judgment if the agreement is clear on its face. See Torres Vargas v. Santiago Cummings, 149 F.3d 29, 33 (1st Cir. 1998). If the agreement is ambiguous, a court may still grant summary judgment "as long as the extrinsic evidence presented to the court supports only one of the

conflicting interpretations." Id. However, when the extrinsic evidence relevant to interpreting an ambiguous contract is "contested or contradictory," summary judgment is inappropriate. Id. The extrinsic evidence here is contested and contradictory. Thus it is for a factfinder at trial rather than for the court on summary judgment to apply Puerto Rico's provision that "[t]he interpretation of obscure stipulations of a contract must not favor the party occasioning the obscurity." 31 P.R. Laws Ann. § 3478.

Puerto Rico's parol evidence rule allows for extrinsic evidence concerning the terms of an ambiguous agreement. P.R. Laws Ann. 32 App. IV R. 69 (1983). In determining the intent of the parties, "attention must principally be paid to [the parties'] acts, contemporaneous and subsequent to the contract." P.R. Laws Ann. 31 § 3472 (1990). On remand, the jury should consider such evidence to determine the intent of the parties with respect to disposition of the $100,000 deposit given by the plaintiffs for the Initial Option Period.

**Vacated and remanded for further proceedings consistent with this opinion.**