GATEWAY GROUP ADVANTAGE, INC., Plaintiff,

v.

Brian K. McCARTHY, et al., Defendants,

Gateway Group Advantage, Inc., Assignee, Third–Party Plaintiff,

v.

American International Specialty Lines Insurance Co., Third–Party Defendant.

No. CIV.A.02–10322–JGD.

United States District Court, D. Massachusetts.

Dec. 4, 2003.

John W. Brister, Bristler & Zandrow, Boston, MA, Gerard F. Hempstead, St. Louis, MO, for Gateway GroupAdvantage LLC, Plaintiff.

Debbie C. Isle, Richard E. Quinby, Craig and Macauley Professional Corporation, Boston, MA, John J. McGivney, Rubin & Rudman, LLP, Boston, MA, for Consumer Insurance Services of America, Insurance Holdings of America, Insurance Technology Services of America, Brian K. McCarthy, Defendants.

John G. Ruan, Finnegan, Underwood, Ryan & Tierney, Boston, MA, for American Intern. Specialty Lines Ins. Co.

## MEMORANDUM OF DECISION AND ORDER ON AISLIC'S MOTION FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

The defendant insureds (collectively "IHA") brought a third-party action against their insurer, American International Specialty Lines Insurance Company ("AISLIC"), seeking defense costs and indemnification for claims asserted against IHA by the plaintiff, Gateway Group Advantage, LLC ("Gateway"). In the underlying action, Gateway sued IHA claiming that IHA was liable for misrepresentation and related wrongs arising out of the sale of insurance franchises by IHA to Gateway.

AISLIC has denied coverage under IHA's Directors, Officers and Private Company Liability Insurance Policy (the "Policy") on the grounds that the wrongs alleged are "related wrongful acts" to acts which pre-date December 18, 1998, the date insurance coverage commenced, and are, therefore, excluded from coverage. AISLIC has filed a Motion for Summary Judgment (Docket # 55) to that effect. IHA[1] opposes the motion, and in its opposition has cross-moved for summary judgment (Docket # 60).

For the reasons detailed herein, AISLIC's motion for summary judgment is ALLOWED, and IHA's cross-motion for summary judgment is DENIED.

### II. STATEMENT OF FACTS[2]

1. Gateway and IHA have settled the underlying action, and IHA has assigned its claims against AISLIC to Gateway. (Docket # 50). Therefore, Gateway actually filed the opposition to the motion for summary judgment. However, since Gateway simply stands in the shoes of IHA, to avoid confusion, references to the insured will continue to be to IHA.

2. AISLIC submitted a Concise Statement of Material Facts ("Facts") (Docket # 57). It is supported by various exhibits filed in a separate volume ("Ex.") (Docket # 58) as well as the Affidavit of David Kuffler which includes additional documents (Docket # 59). In its memorandum in opposition to AISLIC's motion ("Opposition") (Docket # 60), IHA ac-

In or about December 1997, IHA[3] entered into a Marketing Alliance Agreement with the retailer Sam's Club through which IHA was to sell franchises to independent insurance agents to operate kiosks inside Sam's Club stores, through a program known as the Sam's Group Advantage Program. *See Complaint* (Docket # 1) ¶ 7; *Answer* (Docket # 12) ¶ 7. It was contemplated that consumers would be able to buy all types of insurance at the kiosks, including auto, home, boat, disability, long-term care, and life insurance, as well as a business owners' program providing property, liability, workers' compensation, commercial, auto and umbrella insurance. *Complaint* ¶ 7. It was understood that the franchisees "were going to be able to complete an insurance transaction at the kiosk, quote multiple companies, multiple products at a discounted price, conclude the transaction, and eventually even issue a policy at the kiosk." *Facts* ¶ 13.

On November 4, 1998, Gateway executed an Option Agreement to purchase up to five franchises from IHA. *Facts* ¶ 4, Ex. I. Gateway paid $17,000 for this Option. *Facts* ¶ 4, Ex. J. Gateway and IHA continued to meet following the execution of the Option Agreement. *See Facts* ¶ 4. On December 15, 1998, Gateway notified IHA of its intent to "take the Franchise for the O'Fallon, Illinois Sams Club." Ex. M, *Facts* ¶ 4. The next day, on December 16, 1998, Gateway[4] executed both a License Agreement (Ex. N) and a Software License Agreement (Ex. O) for the Illinois franchise, and paid an additional $13,000. *Facts* ¶ 4. In March 1999, after an additional meeting with IHA in Massachusetts, Gateway exercised the Option to purchase additional franchises in Missouri. *Facts* ¶ 4. Gateway operated the Illinois and Missouri franchises until mid-2000, when IHA effectively ceased doing business. *Facts* ¶ 5.

### Other Lawsuits

The collapse of IHA led to a number of lawsuits, involving Gateway as well as other franchisees. *Facts* ¶¶ 7–8, 10. These lawsuits established that IHA had a common marketing program for the sale of franchises, and that the claims brought by Gateway against IHA in the instant case arise out of a common nucleus of facts as IHA's conduct vis-à-vis other franchises which predates the coverage period.

■ On August 9, 2000, Gateway brought suit against IHA in Illinois relating to the Illinois franchise it had purchased. *Facts* ¶¶ 7–8.[5] As detailed in the complaint filed therein, IHA allegedly made misrepresentations in order to induce prospective franchisees to enter into the agreements for the insurance franchises, and the "prospective franchisees" did rely on these representations to their detriment. *See, e.g.,* Ex. F at ¶ 11. The misrepresentations related to, *inter alia,* the capabilities of the software system licensed by Gateway, the availability of the promised lines of insurance, the number of insurance carriers committed to the program, and the staffing and qualifications of IHA's call center staff. *See, e.g.,* Ex. F at ¶ 12. The fact that the same representations were at issue in connection with Gateway's decision to enter into both the Illinois and Missouri franchises is evident

---

cepted these facts as true, although it disputes their significance. *Opposition* at 2.

**3.** Since the differences between the defendant companies are not relevant to the instant dispute, they will be referred to collectively as IHA.

**4.** The agreements are actually between CISA, a subsidiary of IHA, and Welsch, Flatness & Lutz, Inc., Gateway's predecessor. *Facts* ¶ 3.

**5.** The current Massachusetts action relates only to the Missouri franchises.

from the Illinois complaint itself. As Gateway alleged in that action:

As a direct result of these misrepresentations and omissions Plaintiffs have paid franchise fees, hired employees, purchased and leased computers and equipment and rented space *both in Missouri and Illinois,* and have suffered damages in excess of $75,000.

Ex. F at Count I ¶18; Count II ¶7; Count III ¶1 (emphasis added).[6]

On February 22, 2002, Gateway filed the instant action against IHA in Massachusetts relating only to the Missouri franchises.[7] The complaint omits any information about Gateway's acquisition of the Illinois franchise or to the Option it had signed in November 1998. The first meeting between IHA and Gateway referenced in the complaint is the February 1999 meeting in Massachusetts. *See Complaint* ¶9. Nevertheless, the alleged misrepresentations made concerning the Missouri franchises track those allegedly made in order to induce Gateway to purchase the Illinois franchise. For example, Gateway contends that it was provided with false information about the licensed software, the availability of promised lines of insurance, the number of insurance carriers committed to the program and the qualifications and staffing of IHA's call center staff. *See, e.g., Complaint* ¶18.

Several other actions have been brought against IHA, its officers and directors. For example, Scott Harris and Dick Harris Insurance Agency brought suit in a California state court (the "Harris suit") relating to their purchase of franchises from IHA in August 1998, and on December 3, 1998, December 8, 1998, March 5, 1999 and April 21, 1996. Ex. D at ¶¶14, 20, 25, 30, 35. In connection with each of these franchises, it was alleged:

In order to induce Plaintiffs to purchase the franchises and to continue their plans, investments in office hardware, personnel, and related items in preparation of performing under the franchises, said Defendants represented to Plaintiffs that Defendants had developed an integrated insurance sales idea and program, that it was ready to be marketed, that Defendants were knowledgeable of the California insurance market and regulations and that they had entered into one or more agreements with Sam's Club under which Plaintiffs would acquire the right to open sales facilities in specific Sam's Club locations for the purpose of marketing insurance policies and related products and services to Sam's Club members at favorable prices. Defendants further represented that they held in trust franchise fees that Plaintiffs paid and that said fees would

---

**6.** IHA argues in a footnote that Gateway is not bound by complaints which were amended. *Opposition* at 13 n. 6. However, the relevance of this argument to the instant dispute is not clear. In both the Second and Third Amended Complaints in the Illinois action, Gateway continued to allege that "[a]s a direct result of these misrepresentations and omissions which Plaintiffs relied on, Plaintiffs have paid franchise fees, hired employees, purchased and leased computers and equipment and rented space both in Missouri and Illinois and have suffered damages in excess of $75,000.00." *Affidavit of David Kuffler* (Docket # 59) at ¶1; Second Amended Complaint at ¶40; Third Amended Complaint at

¶31. Moreover, whether prior pleadings constitute an evidentiary admission is "left to the discretion of the trial judge under Fed.R.Evid. 403." *Vincent v. Louis Marx & Co., Inc.,* 874 F.2d 36, 41 (1st Cir.1989). Thus, there is no *per se* bar on their admissibility or relevance as IHA contends. There is no need for this court to address whether different pleadings in the Illinois case are relevant or admissible since there are no specific inconsistencies between the pleadings.

**7.** Summary judgment was entered on behalf of IHA in the Illinois case. The appeal was pending in the Seventh Circuit when suit was brought in Massachusetts. *Facts* ¶15.

be returned to Plaintiffs if Defendants failed to deliver to Plaintiffs agreements with the specific Sam's Club locations purchased by Plaintiffs.

Ex. D at ¶ 45. These alleged misrepresentations are substantially similar to those alleged by Gateway.

In addition to the Harris suit, Jerry and Robin Knighten sued IHA's officers and directors in a California state court (the "Knighten suit"). The Knightens had purchased franchises from IHA on December 10, 1998 and March 9, 1999. Ex. E at ¶¶ 14, 20. The same misrepresentations were allegedly made to the Knightens. Ex. E at ¶ 31.

While not controlling, it is noteworthy that on January 9, 2001, IHA's counsel gave notice to AISLIC of the Knighten and Harris litigation. Ex. G. Therein, it was the position of IHA that Gateway's Illinois suit was a "related wrongful act claim" to the California claims, and that there were "possible additional claims that may be made in the future for related wrongful acts by other parties" who had purchased franchises under the Group Advantage Program. *Id.* As a result, IHA claimed that only one $75,000 retention applied to all of these claims. *Id.* Under the Policy there was a $75,000 retention "for Loss arising from Claims alleging the same Wrongful Act or Related Wrongful Acts." Ex. A at p. 2, Item 5.

### *The Insurance Policy*

On December 18, 1999, AISLIC issued the Policy to IHA. *Facts* at ¶ 1(a). The Policy was effective from that date until December 18, 2000. *Facts* at ¶ 6. Under Endorsement # 6, entitled "Prior Acts Exclusion," AISLIC provided an additional one-year period of retroactive coverage for "wrongful acts" that occurred on or after December 18, 1998. Ex. A at Endorsement # 6. Thus, this Endorsement stated:

Prior Acts Exclusion

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim(s) alleging *any Wrongful Act(s)* which occurred prior to December 18, 1998. This policy only provides coverage for Loss arising from Claims which allege *Wrongful Acts* occurring on or after December 18, 1998 and prior to the end of the Policy Period and otherwise covered by this policy. *Loss(es) arising out of the same or Related Wrongful Act(s) shall be deemed to arise from the first such same or Related Wrongful Act.*

*Id.* (emphasis added). The Policy defines "Wrongful Act," in relevant part, as:

(1) with respect to Individual Insureds, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds in their respective capacities as such, or any matter claimed against such Insured solely by reason of their status as directors, officers or Employees of the Company.

Ex. A at p. 6 ¶ 2(t)(1). Finally, "Related Wrongful Acts" are defined as:

Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from a common nucleus of facts. Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action.

Ex. A at p. 4 ¶ 2(p). At issue in this litigation is whether the misrepresentations alleged by Gateway in connection with the Missouri franchises are related wrongful acts to those made in connection with the franchise program prior to December 18, 1998. For the reasons detailed herein, this court finds that they are.

## III. *DISCUSSION*

### A. *Standard of Review*

#### *Choice of Law*

As an initial matter, the parties agree that Massachusetts law should govern this diversity dispute. IHA has a place of business in Massachusetts, and the Policy was written in Massachusetts. *See* Memorandum in Support of Third–Party Defendant's Motion for Summary Judgment ("Mem.") (Docket # 56) at 4–5. "Because the parties agree that Massachusetts law governs this dispute, and because there is at least a 'reasonable relation' between the dispute and the forum whose law has been selected by the parties, [the court] will forego an independent analysis of the choice-of-law issue and apply Massachusetts law." *Bird v. Centennial Ins. Co.*, 11 F.3d 228, 231 n. 5 (1st Cir.1993). *Accord Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 8 (1st Cir.2000).

#### *Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Cross-motions for summary judgment "do not alter the basic Rule 56 standard," rather such motions simply require the court to "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Group, Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir.2001).

#### *Interpretation of Insurance Policies*

■ At issue in this litigation is the meaning and application of Endorsement # 6, the Prior Acts Exclusion, to the instant case. An insurer "has no duty to defend a claim that is specifically excluded from coverage, but the insurer bears the burden of establishing the applicability of any exclusion." *Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir.2000) (applying Massachusetts law).

■ "Interpretation of an insurance policy is no different from interpretation of any other contract." *Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381, 688 N.E.2d 951, 952 (1998). Consequently, interpreting the terms of an insurance policy presents a question of law for the court. *See Cody v. Conn. Gen. Life Ins. Co.*, 387 Mass. 142, 146, 439 N.E.2d 234, 237 (1982). If no ambiguity exists, the court must "construe the words of the policy in their usual and ordinary sense." *Citation Ins. Co. v. Gomez*, 426 Mass. at 381, 688 N.E.2d at 952 (internal citations and quotation omitted). However, any ambiguity is interpreted "in the way most favorable to the insured." *Id.*, 688 N.E.2d at 953.

■ "Ambiguity exists when the policy language is susceptible to more than one rational interpretation . . . . But it does not follow that ambiguity exists solely because the parties disagree as to the provision's meaning." *Brazas Sporting Arms v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d at 4–5 (internal citations omitted). Applying these principles to the instant case compels the conclusion that the Policy at issue is not ambiguous, and that Gateway's claim against IHA is not covered due to the Prior Acts Exclusion.

### B. *The Meaning of "Wrongful Acts"*

■ IHA contends that its conduct vis-à-vis the Illinois franchise is not relevant to the instant case, and cannot serve as the basis for a "related wrongful act" because such conduct does not constitute a "wrongful act" under the Policy. *See Opp.* at 7 ("none of the pre-December 18, 1998 conduct cited by AISLIC qualifies, in the first instance, as a 'Wrongful Act' within the

meaning of its insurance policy"). Relying on *Golf Course Superintendents Assoc. of Am. v. Underwriters at Lloyd's, London,* 761 F.Supp. 1485 (D.Kan.1991), IHA contends that there is no allegation that its conduct pre-December 18, 1998 was "negligent" and that, consequently, it cannot have committed a "wrongful act" under the Policy. This argument misconstrues the language of the Policy at issue in this case, as well as the court's holding in *Golf Course Superintendents.* IHA's conduct challenged by Gateway in the Illinois lawsuit (pre-December 18, 1998) constitutes "wrongful acts" under the Policy.

In *Golf Course Superintendents,* the issue presented was whether a D & O policy provided indemnity for intentional acts. The plaintiff had been found by a jury in another case to have illegally retaliated against an employee by terminating his employment because he had previously sued the company under 42 U.S.C. § 1981. *Id.* at 1487. At issue was whether such intentional conduct constituted a "wrongful act," which was defined in that policy as:

> any negligent act, error, omission, misstatement or misleading statement committed or alleged to have been committed by [the Company] or its Directors, Officers, employees . . . .

*Id.* In addition, the policy excluded "any coverage of claims arising out of or directly or indirectly attributable to 'dishonesty' of [the Company]." *Id.* The court concluded that intentional conduct, such as retaliation, was not included in the definition of "wrongful acts." *Id.* at 1489–90, and cases cited. The contract terms were not ambiguous, and it made "better sense and capture[d] the intent of the parties to construe the definition of 'wrongful act' so that the word 'negligent' modifies every relevant term of the definition. It would be self-defeating to limit the definition of 'wrongful act' to negligent acts, but at the same time cover intentional errors or omis-

sions." *Id.* at 1490. The holding in *Golf Course Superintendents* was based on the specific language of the policy at issue in that case, and did not purport to make a blanket rule about the meaning of D & O policies in general.

As an initial matter, it appears that in the instant case the types of claims raised with respect to the pre-December 18, 1998 Illinois and California franchises would constitute "negligent" conduct even under the policy in *Golf Course Superintendents.* Gateway's Illinois action is based on claims of "negligent misrepresentation." Ex. F at Count I. Similarly, the Harris and Knighten suits each contain a cause of action based on "representations negligently and carelessly" made. Ex. D at Count 7, ¶ 46; Ex. E at Count 4, ¶ 32. Such "negligent misrepresentations" would constitute "wrongful acts" even under the *Golf Course Superintendents* case. 761 F.Supp. at 1490 (negligent misrepresentations covered by the policy).

Moreover, IHA does not explain why its conduct vis-à-vis the Missouri franchises is a covered "wrongful act" while the representations it allegedly made about the Illinois franchise do not qualify as a "wrongful act." IHA describes the claims relating to the Missouri franchises as "claims of *negligent misrepresentations* by AISLIC's insureds regarding the purchase of rights to a franchise operation in the state of Missouri—nothing more, nothing less." *Opp.* at 9 (emphasis added). Even assuming that different misrepresentations were made about the Illinois franchise, they were apparently of the same type as the later misrepresentations. Thus, if the "negligent misrepresentations" made about the Missouri franchises are "wrongful acts" under the Policy, the "negligent misrepresentations" made prior to December 18, 1998 about the Illinois franchises similarly qualify as "wrongful acts."

Furthermore, the language in the Policy at issue in this case differs from that in *Golf Course Superintendents.* Here, the Policy defines "wrongful acts" as:

> any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds . . . .

Ex. A at p. 6 ¶ 2(t)(1). The conduct described is not modified by the term "negligent." Rather, the language in IHA's Policy is the "typical" language in D & O policies. *See* Jeffrey W. Stempel, *Law of Insurance Contract Disputes* § 19.03 (2d ed.1999 & 2003 supp.). "Although the wording of particular policies may vary, the typical definition does indeed cover more than what one commonly thinks of as mere negligence: misstatement, misleading shareholders, regulators or the public, foolishly overcompensating an incompetent CEO, refusing to rein in the CFO's rampant sexual harassment of subordinates and so on." *Id.* Thus, D & O policies are generally "thought to cover the insureds for things that go beyond mere oversight" but do "not go so far as to provide coverage for specifically untended illegality or intentionally inflicted harm or looting of the corporate entity." *Id.*

In sum, IHA's alleged conduct prior to December 18, 1998 constitutes "wrongful acts" under the Policy. Consequently, the next issue which must be addressed is whether they are "related wrongful acts" to the later misrepresentations allegedly made about the Missouri franchises. For the reasons that follow, this court concludes that they are.

### C. *The Meaning of "Related Wrongful Acts"*

Fundamentally, it is IHA's position that the claims regarding the Missouri franchises cannot be related to the pre-December 18, 1998 representations because the Missouri franchises *per se* were not discussed until 1999, and because the representations made relating to the Missouri franchises could not have been proved to be false until after Gateway purchased those franchises and began operating them which did not occur until well after December 1998. Unfortunately for IHA, however, it cannot point to any misrepresentations made specifically about the Missouri franchises which caused Gateway damage. Rather, based on the undisputed facts presented to this court, Gateway was damaged because IHA made material misrepresentations about its ability to satisfy its obligations under the franchise program in general, these basic obligations did not change either over time or with the locale of the franchise. The fact that the same misrepresentations may give rise to claims by different claimants, and may give rise to different causes of action based on the laws of different states does not prevent the claims from being "related" under the clear terms of the policy. *See* Ex. A at p. 4 ¶ 2(p) ("Claims can allege Related Wrongful Acts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action.").

The parties have not cited any cases directly on point which address the definition of a related wrongful act. Nevertheless, giving the language of the Policy its ordinary meaning, this court finds that the conduct complained of vis-à-vis the Missouri franchises was the "same" and/or "related" and/or "[arose] from a common nucleus of facts" as the pre-December 18, 1998 claims relating to the Illinois franchise.[8]

---

8. The Illinois franchise and related agreements were signed prior to December 18, 1998. While this court recognizes that discussions relating to that franchise and the

problems Gateway was facing in connection with it continued into the period covered by the Policy, Gateway has not identified any misrepresentations made during the Policy

As detailed above, all the complaints establish that the representations about which Gateway is complaining in connection with the Missouri franchises are substantially the "same" as those made in connection with the Illinois franchise. This conclusion is supported by the deposition testimony of Gateway and IHA personnel. For example, Dennis Flatness, Gateway's principal, testified that the misrepresentations about the Missouri franchises were made during the initial discussions with Jeff Ensinger and others of IHA which took place in "November or December" of 1998. Ex. X at 163–65. These misrepresentations were part of the standard "sales pitch." *Id.* at 164. Mr. Flatness described the misrepresentations as involving:

> Multiple companies, multiple products, that we were going to be able to complete an insurance transaction at the kiosk, quote multiple companies, multiple products at a discounted price, conclude the transaction, and eventually even issue a policy at the kiosk.

*Id.* Jeffrey Ensinger, IHA's sales representative, confirmed that he had made these representations to Mr. Flatness. Ex. Y at 33–35. These representations form the basis of Gateway's complaint about the Missouri franchises, where Gateway objects to the fact that there were not multiple companies or multiple products, they could not complete the transaction at the kiosk, and, generally, that the franchises were not "turn-key" operations, ready to go. *See, e.g., Complaint* ¶¶ 9–18. Thus, the Illinois and Missouri claims are the same.

Even if the wrongful acts relating to the Missouri franchises are not the "same" as the Illinois franchise, they certainly are "related." *Gregory v. The Home Ins. Co.*, 876 F.2d 602 (7th Cir.1989), is instructive on this point. In *Gregory*, an attorney drafted agreements and promissory notes to be used by Producer's Brokerage Co. ("PBC") to sell "investment packages" in connection with the sale of videotapes. *Id.* at 603. The attorney also provided a tax and security opinion concerning the videotapes which proved to be wrong. *Id.* A class action was brought against, *inter alia*, PBC and the attorney. PBC crossclaimed against the attorney. *Id.* At issue was the amount of coverage available, which was contingent upon whether there was a single or multiple claims. *Id.* at 603–04. The insurance policy provided that "[t]wo or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim." *Id.* at 604.

The court concluded that each purchaser's claim, which had been filed separately but consolidated into a class, constituted a single claim, since they "arose from the same conduct" of the attorney. *Id.* at 605. Even more significantly, the court found that these purchasers' claims and PBC's claim constituted a single claim since they were all "related" even though they were based on different documents and opinions given by the attorney. *Id.* at 605–06. These documents were found by the district court to be "interdependent components of a single plan." *Id.* at 605. The Seventh Circuit agreed, concluding that they "were all 'related' in any meaningful sense of the term." *Id.* at 605–06.

The same results were reached in *Continental Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir.2000). There, a class action was

---

period which caused it harm. Rather, Gateway is complaining about having been wrongfully induced into entering into the franchise agreements. For convenience sake, there-

fore, this court will mean the date of execution of the Illinois agreements when referring to the "misrepresentations relating to the Illinois franchise."

brought by individuals who had invested in K.D. Trinh Investments, Inc. against an attorney "for giving inaccurate legal advice, and for making false and misleading statements regarding the legality of K.D. Trinh Investments as securities." *Id.* at 1260. Subsequently, a second class action suit was brought by different investors against a broker who had marketed the investment. *Id.* The broker, in turn, filed a third party complaint against the attorney, claiming that the attorney "had made misrepresentations to him regarding the legality of such investments." *Id.* At issue were the limits of the Lawyers Professional Liabilities Policy.

The court applied the commonly used dictionary definition of "related" as meaning a "logical or causal connection between" two events, and concluded that the first suit by the investors and the suit by the broker against the attorney were "related wrongful acts." *Id.* at 1262–63. As the court held, the attorney "engaged in a series of actions all of which were intended to encourage investment in K.D. Trinh. The language of the insurance policy clearly focuses on the wrongful act or acts, and not on the number of duties breached or injuries sustained." *Id.* at 1263. The court went on to state, in language applicable to the instant case:

> It is clear that [the attorney's] course of conduct encouraged investment in the K.D. Trinh's notes. Though clearly this course of conduct involved different types of acts, these acts were tied together because all were aimed at a single particular goal. The fact that these acts resulted in a number of different harms to different persons, who may have different types of causes of action against [the attorney] does not render the "wrongful acts" themselves to be "unrelated" for the purposes of the insurance contract. Rather, they comprised a single *course of conduct designed to promote investment in K.D.*

Trinh. It is this same course of conduct which serves as the basis for both the [investors] and [broker] litigation. The conduct at issue in both cases was arguably the "same" and at the very least "related" in any common sense understanding of the word.

*Id.* at 1264. Similarly, in the instant case, IHA engaged in a "single course of conduct designed to promote investment" in the franchise program. *Id.* The fact that the sales pitch was made to different people over time, and that the franchises were located in different states, does not render the wrongful acts unrelated. Rather, like in *Wendt*, the conduct at issue in both the Illinois and Missouri claims "was arguably the 'same' and at the very least 'related' in any common sense understanding of the word." *Id.*

Finally, even if the wrongful acts were not the "same" or "related," they "arise from a common nucleus of facts." It is "[b]eyond question [that] under Massachusetts law the phrase 'arising out of' denotes a level of causation that lies between proximate and actual causation" with "arising out of" being "much broader than 'caused by.'" *Merchants Ins. Co. of N.H., Inc. v. USF & G*, 143 F.3d 5, 9 (1st Cir. 1998) (internal citation omitted). Where, as here, a standard sales pitch is used to induce investors, the claims arise out of a "common nucleus of facts." *Cf. In re First Commodity Corp. of Boston Customer Accounts Litig.*, 119 F.R.D. 301, 309–10 (D.Mass.1987) (where standard and generally uniform sales pitch was used to lure unsophisticated, unsuitable investors to invest, there was "enough of a common nucleus of facts, the brokers' approaches of potential investors, to make it appropriate for class treatment"). For this additional reason, therefore, the Missouri claims are "related wrongful acts" with the Illinois claims. Since the Illinois claims arose prior to the coverage period of the Policy,

there was no coverage for the Missouri claims and AISLIC's motion for summary judgment is allowed.

### D. *Duty to Defend*

■ Finally, while not clearly defined, IHA seems to be making an argument that AISLIC should have had an independent duty to defend even if ultimately there is no coverage since AISLIC should have been limited to the admittedly scanty allegations in the Massachusetts complaint (about the Missouri franchises) when making the defense decision. This argument fails because AISLIC was entitled to consider the suit Gateway previously filed in Illinois, as well as the other suits brought to its attention by IHA itself. These facts were "known or readily knowable by the insurer when the defense was tendered" and were therefore appropriately considered on the issue of coverage. *Open Software Foundation, Inc. v. USF & G*, 307 F.3d 11, 15 (1st Cir.2002), and cases cited.

A similar situation was presented in *Farm Family Mut. Ins. Co. v. Whelpley*, 54 Mass.App.Ct. 743, 767 N.E.2d 1101 (2002). There, an accident occurred involving the use of an all-terrain vehicle. The insurer denied a claim for defense and indemnification on the grounds, among others, that the policy excluded accidents occurring away from the defendant's premises. The complaint, however, did not identify the site of the accident. In granting the insurer's motion for summary judgment on the duty to defend, the court held as follows:

> We also acknowledge the defendant's argument that there is a difference between the plaintiff's duty to defend and its duty to indemnify. We agree with the defendant that, when the allegations of the [third-party] complaint are matched against the policy provisions, it would appear that there is coverage under the policy because there is no mention in the complaint that the accident occurred away from the defendant's premises. However, the plaintiff in its investigation learned that the accident occurred off of the insured's premises. Because the duty to defend is based on the facts alleged in the complaint *and those facts which are known by the insurer, the plaintiff rightfully disclaimed its duty to defend* and brought a declaratory action to determine its duties. *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 406 Mass. 7, 10–11, 545 N.E.2d 1156 (1989). Thus, this case falls within one of the rare exceptions to the rule that an insurer has a duty to defend as long as the complaint states or adumbrates a claim within the coverage, *Sterilite Corp. v. Continental Cas. Co.*, 17 Mass.App.Ct. 316, 323–324, 458 N.E.2d 338 (1983), *that exception being the existence of an undisputed extrinsic fact that takes the case outside the coverage and that will not be litigated at the trial of the underlying action.*

*Id.* at 747, 767 N.E.2d at 1104 (emphasis added). Similarly, in the instant case, AISLIC was entitled to rely on the facts brought to its attention by IHA itself in determining that it had no duty to defend the Massachusetts action which related to the Missouri franchises. *See Millipore Corp. v. The Travelers Indem. Co.*, 115 F.3d 21, 35 (1st Cir.1997) ("there is no duty to defend if, at the time the claims were advanced, the insurer 'could reasonably have concluded that no aspect of the . . . claims' fell within the scope of coverage") (internal citations omitted) (alteration in original).

### IV. *CONCLUSION*

For all the reasons detailed herein, AISLIC's motion for summary judgment (Docket # 55) is ALLOWED and IHA's

cross-motion for summary judgment (Docket # 60) is DENIED.