STRANCH, Circuit Judge,
concurring.
I find it a close call whether' Term 8 of the Settlement Agreement is ambiguous *419 or, as determined below, unambiguous. Nevertheless, I concur with the lead opinion. I agree that it is appropriate to remand the case for consideration of the extrinsic evidence, including those parts of the Agreement itself, such as recitals, that aid in construing the contract and determining the parties’ intentions.
This appeal grows out of the Agreement governing the global settlement that required dismissal of all seven qui tam cases, including Appellees’ cases. At issue is whether CHS must pay attorney fees for the nearly 7,000 billable hours of work performed by counsel for these relators, primarily work that the Government assigned them to do. I write separately to address the purposes and goals of the False Claims Act, which set the perspective through which the courts (and the government) should view all FCA litigation.
Health care fraud is rampant in the United States. Some estimate that fraud costs Medicare and Medicaid between $30 billion and $98 billion annually. See Donald M. Berwick & Andrew D. Hackbarth, Eliminating Waste in U.S. Health Care, 307 J. Am. Med. Ass’n 1513, 1514 (2012). In one way or another, we all pay for this fraud through higher health insurance premiums, co-payments, and taxes.
The FCA is one of the Government’s most effective tools for combatting health care fraud. “To date, the FCA has helped the government recover more fraudulently spent Medicare dollars than any other mechanism within the federal government.” Joshua A. Levy, Lessons from the Private Enforcement of Health Care Fraud, 53 Am. Crim. L. Rev. 117, 135 (2016). In 2014, for instance, while the Government recovered only $454 million through the Department of Health and Human Services’ fraud prevention system, id. at 124, it recovered $2.3 billion from health care FCA cases, id. at 127. In addition, evidence provided by FCA whistle-blowers “has resulted in dozens of criminal convictions and administrative exclusions that otherwise may not have occurred.” Id. at 127.
Most of these recoveries would not be possible without the FCA’s qui tam provision. “Of the $21 billion recovered by the government between 1986 and 2008 under the Act, over 63 percent, or $13.7 billion, was recovered in cases filed under the FCA’s qui tam provisions.” Matthew S. Brockmeier, Pulling the Plug on Health Care Fraud: The False Claims Act After Rockwell and Allison Engine, 12 DePaul J. Health Care L. 277, 278-80 (2009). Brockmeier explains that if courts lose sight of the legislative intent behind the FCA and restrict opportunities for qui tam plaintiffs to succeed under the FCA, “the incidence of health care fraud against the government can only be expected to increase” and thereby increase health care costs “to a public already struggling to pay some of the highest health care prices in the industrialized world.” Id. at 302-03. He concludes that it is crucial to approach the Act “with its primary goal of preventing fraud in mind,” id., which underscores the need to support and encourage qui tam plaintiffs in their use of the FCA.
Without a doubt, relators and their attorneys play a vital role in rooting out health care fraud and obtaining recovery of the public monies that were intended to be spent for providing health care to veterans and poor, elderly, and disabled citizens. Fostering such recoveries under the FCA must include recognition that these actions are not -without economic risks and other dangers to relators and their counsel. A relator takes very real risks in coming forward to report fraud—an action that often includes obtaining and providing evidence against his/her employer that in *420 volves substantial sums of money and potential criminal liability. And providing that evidence is just the beginning. Attorneys then must undertake the substantial investigative work and expense of putting together a case for their relators then present it to government officials to determine if the government is willing to proceed with the litigation. Counsel routinely undertake this work without knowing whether other qui tam complaints have been filed under seal elsewhere. If the government decides that the information provided would be useful to it in vindicating society’s interests, it may share information about other qui tam cases and create a group of counsel to do the work that is necessary to prosecute the case. This work often takes years during which the government runs the sealed case, including assigning tasks to various counsel and approaching the defendant about the claims and monetary settlement. To consummate any settlement it negotiates, the government intervenes in and unseals the qui tam complaints filed by relators on its behalf. Though the government’s bargain sets the basic terms of the settlement agreement, the timetable, and resolves payment to the relators; counsel are often left to negotiate the terms governing payment of attorney fees—even for the considerable work accomplished by counsel at the government’s behest. Much is at stake because these negotiations may determine whether a defendant—which took public money through health care fraud—must pay a relator’s counsel for their work in forcing the return of that money. There are practical reasons for this framework but it also entails practical problems: negotiations are often rushed, counsel for the various relators may have differing opportunity to draft agreement terms, and they do not have the leverage that the government has.
The goal of the FCA to use qui tam complaints to increase the recovery of public monies will be impacted if relators’ counsel are assigned work and not paid for doing it. As scholarly literature argues and legislative amendments confirm, the courts and government should approach FCA cases in ways that support and do not stifle the Act’s goals and purposes. To achieve those, it seems to me that the government’s litigation activity should encourage citizens to come forward and report fraud and attorneys to take their claims and put in the time and money it takes to make the case against those who defraud the public. If both parties are not fairly compensated, there is no incentive for relators to run the risks of blowing the whistle or for attorneys to put in the significant time and make the large expenditures necessary to prove a case. This is especially true (and particularly complicated) in the massive fraud cases that frequently include a number of relators and their separate counsel. But that is the nature of finding and proving frauds that operate on a large or national scale, a goal of the FCA. Those are the cases that should be nurtured because they are the type of suits that have returned billions of dollars to the public coffers and have served to deter future fraud.
The facts before us are well set out in the lead opinion and the case is appropriately remanded to the district court for resolution, which begins with contract construction. On remand, “[t]he admissibility of extrinsic evidence is a question of law and is properly within [the court’s] province to determine ... [,] the amount of weight to accord extrinsic evidence is a question of fact and must be determined by a trier of fact.” Sault Ste. Marie Tribe of Chippewa Indians v. Granholm, 475 F.3d 805, 816 (6th Cir. 2007). “If a contract contains ambiguities, it generally becomes the task of the fact-finder to use extrinsic *421 evidence to determine the intent of the parties. ... it is for the jury to determine the meaning of the terms” Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd., 525 F.3d 409, 422 (6th Cir. 2008) (applying federal common law). “Where there is no genuine issue of material fact appropriate for resolution by a fact-finder, however, a court may rely on extrinsic evidence to aid in contract interpretation.” Id.